# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| VICTOR BLAHUT, Individually and on Behalf of All Other Persons Similarly Situated, | **Civil Action No.: 12-3279** |
| Plaintiff, | **<u>JURY TRIAL DEMANDED</u>** |
| v. | |
| ACCRETIVE HEALTH, INC., MARY A. TOLAN, and JOHN T. STATON, | |
| Defendants | |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Victor Blahut ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Accretive Health, Inc. ("Accretive" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased Accretive securities between March 2, 2011 and

April 24, 2012, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2.      Accretive offers health care revenue cycle consulting services.  The Company helps its customers avoid bad debt write-offs, uncompensated care, payor denials and corresponding administrative write-offs, and lost revenue for missed charges.

3.      On March 29, 2012, Accretive revealed that in response to a lawsuit filed by Minnesota Attorney General ("AG"), the Company had agreed to no longer collect debts on behalf of Fairview Health Services ("Fairview").

4.      On this news, Accretive shares declined $4.46 per share or 18.5%, to close at $19.60 per share on March 29, 2012.

5.      On April 24, 2012, the Minnesota AG released a six-volume report detailing Accretive's aggressive debt collection practices, including demanding payment from patients who were currently seeking medical care in hospitals.  The next day, an article published by *The New York Times* ("NY Times") discussed the Minnesota AG's report.

6.      On these revelations, Accretive shares declined $7.74 per share or nearly 42%, to close at $10.75 per share on April 25, 2012.

7.      Throughout the Class Period, defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was violating privacy standards under the Health Insurance Portability and Accountability Act ("HIPAA") and the Health Information Technology

2

for Economic and Clinical Health ("HITECH") Act; (2) the Company failed to encrypt protected patient health information; (3) the Company failed to sufficiently limit access of protected health information; (4) the Company was in violation of certain Minnesota state laws, among others, debt collection, privacy and consumer protection laws; (5) the Company lacked adequate internal and financial controls; and (6) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

8.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

11.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b) as Accretive's principal place of business is located within this District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff as set forth in the attached certification purchased Accretive securities at artificially inflated prices during the Class Period and has been damaged thereby.

14.     Defendant Accretive is a Delaware corporation, with its principal place of business located at 401 North Michigan Avenue, Suite 2700, Chicago, IL 60611.  Accretive's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "AH."

15.     Defendant Mary A. Tolan ("Tolan"), a founder of the Company, has served as its President and Chief Executive Officer ("CEO") and as a Director since November 2003.

16.     Defendant John T. Staton ("Staton") has served as the Company's Chief Financial Officer ("CFO") and treasurer since September 2005.

17.     The defendants referenced above in ¶¶ 15 through 16 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Accretive is a leading provider of services that help healthcare providers generate sustainable improvements in their operating margins and healthcare quality while also improving patient, physician and staff satisfaction. The Company's core service offering in revenue cycle management services assists U.S. healthcare providers in more efficiently managing their revenue cycles, which encompass patient registration, insurance and benefit verification, medical treatment documentation and coding, bill preparation and collections. Fairview is a $2.8 billion healthcare system based in Minnesota.  In November 2010, Accretive and Fairview entered into a five-year agreement for the Company's Quality and Total Cost of Care Service platform.  For

2010 and 2011, Fairview accounted for 10.7% and 12.2% of Accretive's total net services revenue, respectively.

**Materially False and Misleading**
**Statements Issued During the Class Period**

19.     On March 2, 2011, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2010.  For the fourth quarter, the Company reported net income of $5.5 million, or $0.06 diluted earnings per share ("EPS") and revenue of $170 million, as compared to net income of $2.3 million, or $0.05 diluted EPS and revenue of $137.5 million for the same period a year ago.  For the year, the Company reported net income of $12.6 million, or $0.13 diluted EPS and revenue of $606.3 million, as compared to net income of $6.5 million, or $0.15 diluted EPS and revenue of $510.2 million for the same period a year ago.

20.     On March 18, 2011, the Company filed an annual report for the period ended December 31, 2010 on Form 10-K with the SEC, which was signed by, among others, Defendants Tolan and Staton, and reiterated the Company's previously announced annual financial results and financial position.   In addition, the Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Tolan and Staton, stating that the financial information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

21.     The 10-K represented the following, in relevant part:

We provide our revenue cycle and quality and total cost of care service offerings pursuant to managed service contracts with our customers. In rendering our services, we must comply with customer policies and procedures regarding charity care, personnel, compliance and risk management as well as applicable federal, state and local laws and regulations.

***

Data and information regarding our customers' patients is encrypted when transmitted over the internet or traveling off-site on portable media such as laptops or backup tapes.

\*\*\*

The customers we serve are subject to a complex array of federal and state laws and regulations. These laws and regulations may change rapidly, and it is frequently unclear how they apply to our business. We devote significant efforts, through training of personnel and monitoring, to establish and maintain compliance with all regulatory requirements that we believe are applicable to our business and the services we offer.

22.     On March 30, 2011, the Company announced the completion of a public offering of 7,475,000 shares of the Company's common stock at a price of $23.50 per share.

23.     On May 11, 2011, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2011.  For the quarter, the Company reported net income of $160,000 or $0.00 diluted EPS and revenue of $163.7 million, as compared to net income of $143,000, or $0.00 diluted EPS and revenue of $125.9 million for the same period a year ago.

24.     On May 12, 2011, the Company filed a quarterly report for the period ended March 31, 2011 on Form 10-Q with the SEC, which was signed by Defendants Tolan and Staton and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Tolan and Staton, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

25.     On August 10, 2011, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2011.  For the quarter, the Company reported net income of $8.6 million, or $0.08 diluted EPS, and revenue of $183.6 million, as compared to net

income of $3.9 million, or $0.04 per diluted EPS, and revenue of $151.9 million for the same period a year ago.

26.     On August 12, 2011, the Company filed a quarterly report for the period ended June 30, 2011 on Form 10-Q with the SEC, which was signed by Defendants Tolan and Staton and reiterated the Company's previously announced quarterly financial results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Tolan and Staton, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

27.     On November 9, 2011, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2011.   For the quarter, the Company reported net income of $7.3 million, or $0.07 diluted EPS and revenue of $219 million, as compared to net income of $2.9 million, or $0.03 diluted EPS and revenue of $158.4 million for the same period a year ago.

28.     On November 10, 2011, the Company filed a quarterly report for the period ended September 30, 2011 on Form 10-Q with the SEC, which was signed by Defendants Tolan and Staton, and reiterated the Company's previously announced annual financial results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Tolan and Staton, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

29.     On January 19, 2012, the Minnesota Attorney General filed a lawsuit against Accretive alleging that the Company had violated health privacy laws, state debt collection laws

and state consumer protection laws. Specifically, the lawsuit is in connection with a medical privacy security breach that occurred in July 2011 when an Accretive employee's laptop was stolen from his rental car. The laptop contained unencrypted medical records of 23,500 patients. On February 3, 2012, the Minnesota Department of Commerce temporarily suspended Accretive's debt collection license in the state of Minnesota.

30.     On February 29, 2012, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2011. For the fourth quarter, the Company reported net income of $13.2 million, or $0.13 diluted EPS and revenue of $260 million, as compared to net income of $5.5 million, or $0.06 diluted EPS and revenue of $170 million for the same period a year ago. For the year, the Company reported net income of $29 million, or $0.29 diluted EPS and revenue of $826.3 million, as compared to net income of $12.6 million, or $0.13 diluted EPS and revenue of $606.3 million for the same period a year ago.

31.     On February 29, 2012, the Company filed an annual report for the period ended December 31, 2011 on Form 10-K with the SEC, which was signed by, among others, Defendants Tolan and Staton, and reiterated the Company's previously announced annual financial results and financial position. In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Tolan and Staton, stating that the financial information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

32.     The Form 10-K represented the following in relevant part:

We provide our revenue cycle and quality and total cost of care service offerings pursuant to managed service contracts with our customers. In rendering our services, we must comply with customer policies and procedures regarding

charity care, personnel, compliance and risk management as well as applicable federal, state and local laws and regulations.

\*\*\*

Data and information regarding our customers' patients is encrypted when transmitted over the internet or traveling off-site on portable media such as laptops or backup tapes.

\*\*\*

The customers we serve are subject to a complex array of federal and state laws and regulations. These laws and regulations may change rapidly, and it is frequently unclear how they apply to our business. We devote significant efforts, through training of personnel and monitoring, to establish and maintain compliance with all regulatory requirements that we believe are applicable to our business and the services we offer.

33.    The statements referenced in ¶¶ 20 – 22; 24 – 29; 31 - 33 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (1) the Company was in violation of HIPAA and HITECH's privacy standards; (2) the Company failed to encrypt protected patient health information; (3) the Company failed to limit access of protected health information to only certain necessary individuals; (4) the Company was violating certain Minnesota state laws, among others, debt collection, privacy and consumer protection laws; (5) the Company lacked adequate internal and financial controls; and (6) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

34.    On March 29, 2012, the Company filed a Form 8-K with the SEC where it announced that in the Company's "ongoing effort to resolve its outstanding issues with the Minnesota Attorney General, Accretive Health and Fairview Health Services have decided to amend their revenue cycle operations agreement to transition the management of those

operations to Fairview leadership."  The Form 8-K further revealed the following, in relevant part:

> The company is currently working with Fairview on transition plans. Accretive Health and Fairview will continue their work together on their Quality and Total Cost of Care initiative for population health management.
>
> Accretive Health expects the revenue impact of the new revenue cycle operations arrangement with Fairview to be in the range of $62 million to $68 million, or approximately 6% of the company's expected 2012 revenue. Accretive Health is working to offset the majority of this revenue shortfall with work from new and existing customers.

35.    On this news, Accretive shares declined $4.46 per share or 18.5%, to close at $19.60 per share on March 29, 2012.

36.    On April 24, 2012, Minnesota Attorney General released a six-volume report on the practices of non-profit hospital and clinic operator Fairview Health Services and one of its services providers, Accretive.  The report alleges civil violations of state and federal debt collection regulations, laws governing nonprofits and patient-privacy protections.  According to an article by *Forbes*, the report alleges "Accretive [is] inserting debt collectors into Fairview's admission process, and in some cases, forcing patients to pay before treatment was given." Moreover, the report describes Accretive's culture as "boiler-room-style sales atmospheres" where the Company urged employees to demand payment before medical care was provided and in other situations, demanded to collect payment at patients' bedsides.

37.    On April 25, 2012, the NY Times published an article entitled "Debt Collector Is Faulted for Tough Tactics in Hospitals."

> Hospital patients waiting in an emergency room or convalescing after surgery are being confronted by an unexpected visitor: a debt collector at bedside.
>
> This and other aggressive tactics by one of the nation's largest collectors of medical debts, Accretive Health, were revealed on Tuesday by the Minnesota

attorney general, raising concerns that such practices have become common at hospitals across the country.

The tactics, like embedding debt collectors as employees in emergency rooms and demanding that patients pay before receiving treatment, were outlined in hundreds of company documents released by the attorney general. And they cast a spotlight on the increasingly desperate strategies among hospitals to recoup payments as their unpaid debts mount.

To patients, the debt collectors may look indistinguishable from hospital employees, may demand they pay outstanding bills and may discourage them from seeking emergency care at all, even using scripts like those in collection boiler rooms, according to the documents and employees interviewed by The New York Times.

In some cases, the company's workers had access to health information while persuading patients to pay overdue bills, possibly in violation of federal privacy laws, the documents indicate.

The attorney general, Lori Swanson, also said that Accretive employees may have broken the law by not clearly identifying themselves as debt collectors.

Accretive Health has contracts not only with two hospitals cited in Minnesota but also with some of the largest hospital systems in the country, including Henry Ford Health System in Michigan and Intermountain Healthcare in Utah. Company executives declined to comment on Tuesday.

Although Ms. Swanson did not bring action against the company on Tuesday, she said she was in discussions with state and federal regulators about a coordinated response to Accretive Health's practices across the country. Regulators in Illinois, where Accretive is based, are watching the developments closely, according to Sue Hofer, a spokeswoman with the State Department of Financial and Professional Regulation.

"I have every reason to believe that what they are doing in Minnesota is simply company practice," Ms. Swanson said in an interview, but declined to provide details.

In January, Ms. Swanson filed a civil suit against Accretive after a laptop with patient information was stolen, saying that the company had violated state and federal debt collection laws and patient privacy protections. That action is still pending.

An Accretive spokeswoman declined to comment on whether other states were looking into its practices and issued a brief statement, "We have a great track record of helping hospitals enhance their quality of care." In its annual report, the

11

company said it was cooperating with the attorney general to resolve the issues in Minnesota.

38.     On this news, Accretive's securities plummeted $7.74 per share or nearly 42%, to close at $10.75 per share on April 25, 2012.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Accretive securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

40.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Accretive securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Accretive or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

42.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Accretive;

- whether the Individual Defendants caused Accretive to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Accretive securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

45.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Accretive securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Accretive securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

46.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## <u>COUNT I</u>

### (Against All Defendants For Violations of <u>Section 10(b) And Rule 10b-5 Promulgated Thereunder)</u>

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

49.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Accretive securities; and (iii) cause Plaintiff and other members of the Class to purchase Accretive securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

50. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Accretive securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Accretive's finances and business prospects.

51. By virtue of their positions at Accretive, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant

knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

52.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Accretive securities from their personal portfolios.

53.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Accretive, the Individual Defendants had knowledge of the details of Accretive's internal affairs.

54.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Accretive.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Accretive's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Accretive securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Accretive's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased Accretive securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

55. During the Class Period, Accretive securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Accretive securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of Accretive securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Accretive securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

56. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

58. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

59. During the Class Period, the Individual Defendants participated in the operation and management of Accretive, and conducted and participated, directly and indirectly, in the conduct of Accretive's business affairs. Because of their senior positions, they knew the adverse non-public information about Accretive's misstatement of income and expenses and false financial statements.

60. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Accretive's financial condition and results of operations, and to correct promptly any public statements issued by Accretive which had become materially false or misleading.

61. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Accretive disseminated in the marketplace during the Class Period concerning Accretive's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Accretive to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Accretive within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Accretive securities.

62.     Each of the Individual Defendants, therefore, acted as a controlling person of Accretive.  By reason of their senior management positions and/or being directors of Accretive, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Accretive to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Accretive and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

63.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Accretive.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  May 1, 2012                     **POMERANTZ HAUDEK**
                                        **GROSSMAN & GROSS, LLP**

                                        By:_____s/ Patrick V. Dahlstrom
                                            Patrick V. Dahlstrom

Leigh Handelman Smollar
Joshua B. Silverman
Louis C. Ludwig
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184

**POMERANTZ HAUDEK**
  **GROSSMAN & GROSS, LLP**
Marc I. Gross
Jeremy A. Lieberman
100 Park Avenue, 26th Floor
New York, New York 10017-5516
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

*Attorneys for Plaintiff*

## <u>Certification of Plaintiff</u>
## <u>Pursuant to Federal Securities Laws</u>

1.    I, Victor Blahut, make this declaration pursuant to Section 101 of the Private Securities Litigation Reform Act of 1995 as required by Section 21D (a) (2) of Title I of the Securities Exchange Act of 1934.

2.    I have reviewed a Complaint against Accretive Health, Inc. ("Accretive Health"), and authorize a filing of a comparable complaint on my behalf.

3.    I did not purchase my Accretive Health securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under Title I of the Securities Exchange Act of 1934.

4.    I am willing to serve as a representative party on behalf of a class as set forth in the Complaint, including providing testimony at deposition and trial, if necessary.    I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    To the best of my current knowledge, the attached sheet lists all of my purchases and sales in Accretive Health securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws, except as follows:

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

8.    The matters stated in this declaration are true to the best of my current knowledge, information and belief.

## Summary of Purchases and Sales

| DATE | TRANSACTION TYPE: PURCHASE OR SALE | NUMBER/ TYPE OF SECURITY | PRICE OF SECURITY | COMMISSION |
|------|------|------|------|------|
| 8/17/2011 | PURCHASE | 400 SHARES AH AT $28.50 | $11,407.00 ($28.50 PER SHARE) | ($7.00) |
| 11/18/2011 | PURCHASE | 1100 SHARES AH AT $25.00 | $27507.00 ($25.00 PER SHARE) | ($7.00) |
| 2/8/2012 | PURCHASE | 1700 SHARES AH AT $24.75 | $42082.00 ($24.75 PER SHARE) | ($7.00) |
| 2/10/2012 | PURCHASE | 820 SHARES AH AT $24.24 | $19883.80 ($24.24 PER SHARE) | ($7.00) |
| 2/21/2012 | PURCHASE | 845 SHARES AH AT $23.799 | $20117.16 ($23.799 PER SHARE) | ($7.00) |
| 3/19/2012 | PURCHASE | 3000 SHARES AH AT $25.04 | $75127.00 ($25.04 PER SHARE) | ($7.00) |
| 4/25/2012 | SOLD | 7865 SHARES AH AT $12.231 | $96187.82 ($12.231 PER SHARE) | ($9.22) |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

I declare under penalty or perjury that the foregoing is true and correct.

**Executed** _4/27/2012_ **, at** _BORDENTOWN, NEW JERSEY_
          **(Date)**                          **(City, State)**

_Victor Blahut_
                        **(Signature)**

_VICTOR BLAHUT_
                **(Type or Print Name)**